## MULLEN et v STATE ex ROBSON

Ohio Appeals, 4th Dist, Meigs Co
Decided December 11, 1929

Messrs. Cederic W. Clark and Chalmers Parker, Columbus, for Mullen et.

Mr. A. P. Miller, Pomeroy, for State ex Robson.

MAUCK, J.

The record shows that the presiding judge of elections in the ward in question was called to the stand and testified that there were twenty two absent voters' ballots challenged, and that the ballots of all these absent voters were placed in an envelope and returned to the Deputy State Supervisors; that none of the envelopes containing these several ballots were opened by the local judges. She testifies that every one of the votes in question was refused by the local board by the unanimous votes of all the judges upon the ground that the voters so offering to vote were non-residents. She testifies that the local board took no evidence but decided to return the ballots to the county board unopened because they did know what else to do with them. Again she testifies:

"The evidence on the envelope was all the evidence we had."

There then followed this question and answer:

"Q Now, the only thing on the envelope was the address from which they are mailed?

A Their address and where they were living."

One of the clerks of the election testifies that the ballots were laid to one side and that when others came in to vote whose votes were protested that the latter votes were placed with the absent voters' ballots and all of them given to the presiding judge to return to the county election board, there being twenty seven in all, making necessarily five votes that were received but not cast and twenty two absent voters ballots in identification envelopes that had never been opened.

Another judge testifies that

"These ballots, as they were rejected or protested, of non-residents were put on the table and they were kept there. Those that were non-residents we discussed. The judges among themselves agreed that they were not residents of Middleport and therefore had no right to vote. All the ballots were put on the table and kept there until later in the evening, when they were put under the table and kept there until Mrs. Gilfilen brought them to Pomeroy."

She says that the ballots were rejected and put there as dead ballots. This, in substance, is the whole record.

The question of who was elected central committeeman in this ward is not perhaps a matter of paramount importance. The questions raised, however, are of very great importance and of considerable obscurity. They involve interpretations of the general elections statutes, the primary election statutes and the operation of the absent voters' law.

So far as the five votes that are referred to as "protested votes" are concerned we see no difficulty. Two of them were official ballots issued to R. O. Fowler and Edna Howard. They are marked "Protested" and quite evidently were never

cast, and there is nothing to indicate that they were not properly rejected. The other three ballots, bearing in lead pencil the names of Jacob Young, Peter Stace and Ella Stace, are not official ballots at all, but unofficial, and we are at a loss to know what could be claimed for them or any of them. We have then twenty two absent voters' ballots which were neither counted nor cast, but were turned over to the county election board, and which it is claimed the board ought to count as disputed ballots.

The trial court was confronted with a question of great difficulty and took the not unnatural view that these ballots were to be treated as some sort of ballots, and as the local election board only had a right to send disputed ballots to the county board, and as they did send these ballots to the county board, they must of necessity be disputed ballots. There is a sort of logic to this which might be permitted if we were dealing with private rights. In such a case it might be said that the local judges, having power to send to the county board disputed ballots only, when they sent ballots to that board they must be estopped from asserting that they were not disputed. This is not such a case. It is a question of power. The county board can not be required to count votes where it has no power to do so. Power to count votes must be derived from statute. It can not be conferred by acts of omission or commission on the part of local judges. So far as the general election is concerned the power of the county board to count disputed ballots proceeds from **Section 5090**. In that section they are called uncounted ballots and refer to the ballots described in **Section 5083** as ballots upon which the judges did not agree as to how the same should be counted. In a primary election the term "disputed ballots" is employed. It is found in **Section 4983**.

It is thus seen that both under the general law and the primary law the uncounted ballots or the disputed ballots which the county board may count are votes that have actually been placed in the box but which have been so imperfectly marked that the judges disagree upon the way they shall be counted or whether they shall be counted at all. The only other ballots which can ever be counted by the county board are those absent voters' ballots that never reach the precinct officials.

We might dispose of this case with what has already been said, it being apparent that the votes in question have never been cast and having never been cast are not disputed ballots; that the judgment of the Common Pleas must be reversed because the county board has no power to do what the decree complained of requires it to do. But while mandamus can not issue to compel the county board to canvass and count these ballots it may be that the writ awarded by the Common Pleas may be modified by this court so as to require the county board to issue the relator a certificate of election on the ground that the several absent voters had an undoubted right to have their votes cast and counted, and the court can proceed on the theory that the thing that had to be done was in law actually done. That theory of the situation gives rise to this question: After an absent voter has made the affidavit required and prepared his ballot and mailed it as prescribed by law is his right to have that vote cast an absolute one and has he placed himself in such advantageous position that he can not be challenged as other voters are? It is perfectly apparent that this interpretation of the statute would make the absent voters' law a convenient instrument for fraud and corruption, but the statutes loan themselves to that view.

The process of voting when the voter personally appears is as follows:

"One of the judges of election shall receive the ballot, examine the secondary stub bearing the elector's registered number or name, for the purpose of identification, and thereupon pronounce with an audible voice the name of the elector. If the judges are satisfied that he is a citizen of the United states and legally entitled to vote at the election"

the ballot shall be immediately deposited in the ballot box. **Section 5073.**

If it is an absent voter's ballot, however, the presiding judge

"shall take up one absent voter's identification envelope in the presence of all the judges and after announcing in an audible voice the name of such absent voter he shall tear open such envelope *** and deposit the same in the proper ballot box."

**Section 5078-5.**

If the voter is present and marks his ballot in the booth the judges permit its casting only if satisfied that "he is legally entitled to vote at the election". If he has forwarded his ballot by mail the statute apparently requires the vote to be deposited whether the judges are satisfied or not. It can not be, however, that an absent voter is wholly beyond challenge. Certainly, for instance, if he be insane and therefore disqualified by the Constitution (**Article V, Section 5**) or if he be a convict and the receipt of his ballot a crime (**13257 GC.**) the election judges should not knowingly permit such a vote to be cast, thus subjecting themselves to the penalties of the criminal code (**Sections 13291, 13296 GC.**). We conclude that the omission to repeat in **Section 5078-5 GC.** that the judges must be satisfied of the legality of the ballot tendered is because that section and all the other sections of the absent voters' law undertake to cover only those incidents to voting that are peculiar to that law, leaving undiminished the power and duty of the judges to prevent illegal elections, and leaving unimpaired except as hereinafter pointed out the tenth paragraph of **4866 GC.**, which is as old as the election laws:

"All questions of the right to vote shall be heard and determined by the judges of election."

There is a special reason why the right to challenge must remain open until after the absent voter's ballot has been opened at a primary election. One of the special grounds of challenge in a primary is that the voter has not previously affiliated with the party in whose primary he proposes to participate (4980 GC.), and after the voter swears to his party affiliations his vote may still be rejected by the election judges of that party (4982 GC.), and it is, too, an offense against the criminal laws for either a voter or an election judge to violate the law in this behalf (Sections 13327, 13335; 13337 GC.). A challenge on this ground is, however, not possible until the identification ballot has been opened and it be found in which party primary the voter proposes to participate, for there is nothing on the envelope containing the absent voter's ballot to indicate the party character of the enclosed ballot. We adopt the view of the Attorney General of Ohio that the absent voter as well as another voter is generally subject to challenge. There is, however, one exception to the rule not drawn by inference but especially provided by statute. If the absent voter's ballot is received by the county board too late for delivery to the local board the county board must count the same, no opportunity being given for challenge.

There is, however, another possibility in the case. In some jurisdictions a writ of mandamus has been awarded compelling election officials to permit a voter's ballot to be cast. The fact that in the case at bar a score of ballots has been rejected leads to the view that some at least of those may have been valid and should have been received. The trial court opened the identification envelopes containing the ballots of the absent voters, and we have before us those ballots as well as the identification envelopes bearing the affidavits of those attempting to vote. These we have examined with a view of ascertaining whether the envelopes are so conclusive of the right to vote that the rejection of them was arbitrary and illegal and the exercise of no discretion whatsoever. It is barely possible that under such a state of facts a court, finding that it was the clear duty of the election officials to cast and count these ballots, might find that the relator was indisputably entitled from this group of ballots to enough additional votes as to permit a court to award a writ requiring the issuance of a certificate of election to the candidate thus deprived of those votes. This, we think, would be a wider exercise of the writ of mandamus than has ever been tolerated in this state in the matter of an election, but it is a possibility of the case which has not been overlooked. Certainly if these absent voters' ballots are in such form as to give to the election officials no chance to exercise their judgment they must be in complete compliance with the

law governing them. Neither a fair nor a substantial compliance with the law would be sufficient.

The identification envelope is required to show that the proposed voter is a resident of the precinct in which he desires to vote and a qualified voter therein. It must also give the residence address of the voter, and that means his place of residence in the precinct in which he proposes to vote, for the purpose, of course, of having a check upon the truth of his affidavit. To protect the ballot box against false impersonation the proposed voter must go before a notary public or other competent officer. If the voter is an entire stranger in the community where he undertakes to mark his ballot he can not vote at all. He must be in a community where the attesting officer knows him to be the person he represents himself to be or knows some creditable person who proves the identity of the voter, and the attesting officer must certify whether the proposed voter is actually known to him or is proven by some creditable person, and in the latter case the name and address of such person so proving the identity of the voter must be disclosed.

It is a singular fact that not one of the absent voters' identification envelopes in this case fully and strictly complied with all the requirements of the absent voters' ballot law except those of F. W. Hays, Harry Tipton, Alta Tipton and L. J. Tipton, and it happens that the ballots found in the envelopes of these four voters had all been marked with ink, thus rendering them entirely void and incapable of being counted. **Devine vs. State, 105 OS. 88.** With the votes of A. L. Rayford and Effie Rayford are found the affidavits of those parties that they are not residents of Meigs County, so that nothing can be claimed for them. That leaves sixteen. What are the other identification envelopes? Mildred Fowler swears that she is a resident of the City of Pomeroy in Athens County. Maynard Davis swears that he is a resident of the precinct in question but gives his residence as Bucyrus, and it does not appear whether the attesting notary knew him personally or whether he was identified by another and in the latter case who that other was. The same defect exists as to Eleanor Davis, Dale Winebrenner, Jud Boley, Gilbert Ervin, W. E. Trader, Roscoe Meadows, Oscar Rose, Josiah Mace, Ann Mace, Mildred Gilmore and Carl Gilmore. Fred Bearhs is as defective as Maynard Davis, but he gives no local residence at all. B. H. Ervin gives his residence address and Hattie Ervin hers. They are peculiar in this. The notary public testifies somewhat uncertainly that he either does know them or does not know them, one can not tell which, and then says that each of them is the creditable person who vouches for himself.

There was, consequently, on each of these identification ballots something that called for the exercise of discretion and judgment by the election judges, and the

law is too well settled that a court is without power by mandamus to control or ignore the exercise of discretion conferred by law upon others.

Whether there is any remedy available for a review of the judgment of the election judges either by contest proceedings or by proceedings in quo warranto we can not now decide. We only determine that the county board had no power to count these ballots because they were not disputed ballots, and that there is no modification of the judgment of the trial court that could be made pursuant to law without our invading the judgment and discretion that is confided to the local board of elections.

The grant by the lower court of the writ of mandamus was erroneous. The judgment is reversed with directions to dismiss the petition of the relator.

Middleton, PJ., and Blosser, J, concur.